# United States Court of Appeals for the Federal Circuit

2007-5169

ROSE ACRE FARMS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Geoffrey G. Slaughter, Taft, Stettinius & Hollister, LLP, of Indianapolis, Indiana, argued for plaintiff-appellee. On the brief was Robert R. Clark.

Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeanne E. Davidson, Director, and Sheryl L. Floyd, Senior Trial Counsel. Of counsel on the brief was James A. Booth, Deputy Assistant General Counsel, Regulatory Division, OGC, United States Department of Agriculture, of Washington, DC.

Elizabeth Wydra, Community Rights Counsel, of Washington, DC, for amicus curiae American Public Health Association, et al.

John D. Echeverria, Georgetown Environmental Law & Policy Institute, Georgetown University Law Center, of Washington, DC, for amicus curiae Hoosier Environmental Council, et al.

Appealed from: United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

2007-5169

ROSE ACRE FARMS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in case No. 92-CV-710, Senior Judge Bohdan A. Futey.

_____

DECIDED: March 12, 2009

_____

Before MICHEL, <u>Chief Judge</u>, MOORE, <u>Circuit Judge</u>, and HUFF, <u>District Judge</u>.[*]

MICHEL, <u>Chief Judge</u>.

In 1992, Rose Acre Farms, Inc. ("Rose Acre") filed the present action in the United States Court of Federal Claims, claiming that United States Department of Agriculture ("USDA" or "the government") regulations that restricted egg sales from its farms and caused the loss of egg-laying chickens that tested positive for the presence of salmonella bacteria effected a taking requiring compensation under the Fifth Amendment. In 2003, the trial court held that Rose Acre was entitled to compensation for a taking of the eggs affected by the regulations as well as for hens seized for testing.

---

[*] Honorable Marilyn Huff, District Judge, United States District Court for the Southern District of California, sitting by designation.

In our previous appeal, we held that the court misapplied the standards governing regulatory takings claims under Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978).  We vacated and remanded for appropriate reconsideration.

We must again decide whether the trial court correctly held that the government's regulations, which restricted the sale of certain of Rose Acre's eggs during the approximately two-year period, constituted a taking for which just compensation is due.  As explained below, we hold that, upon a proper assessment of the Penn Central factors, the USDA did not commit a compensable taking.  We therefore reverse the judgment of the Court of Federal Claims.

## BACKGROUND

To the extent the facts of the case aid our present analysis of the takings claim, we repeat those facts from our previous opinion.  Further background and factual details are available in the trial court's opinion being reviewed here and the prior decisions related to the present case.  See Rose Acre Farms, Inc. v. United States, No. 92-710C, 2007 WL 5177409 (Fed. Cl. July 11, 2007) ("Rose Acre V"); Rose Acre Farms, Inc. v. United States, 373 F.3d 1177 (Fed. Cir. 2004) ("Rose Acre IV"); Rose Acre Farms, Inc. v. United States, 53 Fed. Cl. 504, 524 (2002), superseded by 55 Fed. Cl. 643 (2003) ("Rose Acre III"); Rose Acre Farms, Inc. v. United States, No. 92-710C (Fed. Cl. Aug. 7, 1995) ("Rose Acre II") (unpublished decision); Rose Acre Farms, Inc. v. Madigan, 956 F.2d 670 (7th Cir. 1992) ("Rose Acre I").

### I. Rose Acre's Operations

Rose Acre is a family-owned business based in Seymour, Indiana.  It is primarily engaged in the production of table eggs, which are raw poultry eggs sold in their shells.

Between 1955 and 1990, Rose Acre grew from a single layer-hen farm with 1,800 hens to a highly integrated table-egg production business consisting of eight layer-hen farms with millions of hens. Three of Rose Acre's Indiana farms are at issue in this case, namely, Cort Acres (in Cortland), White Acres (in White County), and Jen Acres (in Jennings County).

The production units on each farm are individual layer houses having varying capacities. In 1990, Cort Acres had thirty-six layer houses, each of which contained approximately 70,000 hens, White Acres had twelve layer houses, each containing approximately 125,000 hens, and Jen Acres had twenty-two houses, twenty-one of which were in production with capacities ranging from 67,320 to 112,000 hens.

The details of Rose Acre's vertically integrated production system are set forth in the trial court's earlier opinion. See Rose Acre III, 55 Fed. Cl. at 647. We note here, though, that all of the layer hens in a given layer house at any one time are, as a result of Rose Acre's production system, approximately the same age. Once young hens capable of laying eggs are placed in a layer house, production in that house normally continues uninterrupted for a period of about fifty-seven to sixty weeks, until the hens therein reach the end of their productive lives. When that cycle has ended, the hens are removed and destroyed, and the house is cleaned before new hens are introduced.

To maximize its production and provide a consistent supply of table eggs to the market, Rose Acre must carefully manage its layer house population and depopulation schedules. The trial court found that "[s]cheduling and timing . . . are key components of [Rose Acre's] business. An interruption in [Rose Acre's] scheduling system affects the

entire organization, thus causing [Rose Acre] to be unable to supply eggs to its customers." Id.

## II. USDA's Salmonella Regulations

### A. The Interim Regulations

In the late 1980s, the Centers for Disease Control ("CDC") determined that the incidence and geographic spread of human illness resulting from exposure to Salmonella enteritidis serotype enteritidis ("SE") bacteria were increasing.[1] In response to the increase, the Animal Plant Health and Inspection Service ("APHIS"), a USDA division responsible for preventing the spread of communicable diseases, determined that emergency regulations were necessary to control the spread of SE in poultry flocks. On February 16, 1990, USDA published interim regulations that restricted the interstate sale and transportation of eggs and poultry from flocks determined under the regulations to be SE-contaminated. Poultry Affected by Salmonella Enteritidis, 55 Fed. Reg. 5576 (Feb. 16, 1990) (codified at 9 C.F.R. §§ 82.30–82.36 (1991)). The interim regulations were effective immediately upon publication, USDA having "determined that there is good cause for publishing this rule without prior opportunity for public

---

[1]   According to the trial court:

Salmonella is a gram negative rod-shaped microscopic bacterium that is ubiquitous. There are more than 2,000 serotypes (strains) of salmonella, and it is most commonly found in the intestinal tract of animals and birds. Persons can be exposed to salmonella in many ways, but the most likely exposure is through the consumption of raw or undercooked foods of animal origin, such as meat, poultry, milk or eggs. When a person becomes sick from consuming salmonella, the condition is referred to as salmonellosis. Symptoms in humans include nausea, vomiting, abdominal cramps, diarrhea, fever and headache.

Rose Acre III, 55 Fed. Cl. at 648 n.5.

comment," namely, the need for "[i]mmediate action . . . to prevent harm to the egg-type chicken industry and the public." Id. at 5580.

The interim regulations applied to "flocks," defined as "[a]ll the poultry on one premises," 9 C.F.R. § 82.30 (1991), and operated as follows. If "a Federal or State representative determine[d] through epidemiologic investigation that [a] flock [was] the probable source of disease in an outbreak of [SE-caused] disease in humans or poultry," USDA designated the flock as a "study flock." Id. § 82.32. A study flock was subsequently designated a "test flock" if either (1) "one or more" environmental test samples, i.e., "manure samples and egg transport machinery samples . . . collected and tested in accordance with" procedures set forth in the interim regulations tested positive for SE, or (2) "the person in control of the flock" refused to allow or interfered with the collection of such samples. Id. § 82.32(b). At the time the interim regulations were published, USDA believed that evidence of SE in layer hens' environment meant that the hens were infected and would, therefore, be more likely to produce SE-contaminated eggs. See 55 Fed. Reg. at 5576 (describing the "vertical" (hen to egg) and "horizontal" (environment to hen) modes of SE transmission).

"Test flock" status triggered restrictions on the interstate movement of eggs. Specifically, eggs from a test flock could be moved interstate only for uses requiring pasteurization,[2] and then only if the shipper obtained a permit and met other conditions. 9 C.F.R. § 82.33(a) (1991). Thus, the interim regulations prohibited the interstate shipment of test flock eggs for sale as table eggs.

---

[2] According to Rose Acre, such uses include incorporation into products such as cake mixes. The facilities that process and pasteurize eggs for these uses are known as "breaker plants" and the eggs they process are known as "breaker eggs."

Specified numbers of the hens in test flocks were also required to undergo blood and internal-organ testing. Id. § 82.32(c). A test flock was designated an "infected flock" if the organs of one or more hens tested positive for SE. Id. Infected flocks were subject to the same interstate transportation restrictions as test flocks. Id. § 82.33(a). An infected flock retained its "infected" designation until either (1) the flock was retested in accordance with the regulations and no internal organ tested positive for SE or (2) the houses that contained the infected flock were depopulated, subjected to specified wet cleaning and disinfecting procedures, and repopulated with a new flock. Id. § 82.32(c).

**B. The Final Regulations**

After USDA reviewed comments received from interested parties following the publication of the interim regulations, it published final SE regulations on January 30, 1991. Chickens Affected by Salmonella enteritidis, 56 Fed. Reg. 3730 (Jan. 30, 1991) (codified at 9 C.F.R. §§ 82.30–82.38 (1992)). The final regulations incorporated all of the above requirements but authorized the imposition of restrictions on individual layer houses as opposed to whole flocks. 9 C.F.R. § 82.33(a) (1992). A provision conditioning release from "infected" status on a successful post-cleaning inspection of a depopulated infected house by a federal or state official was added. Id. § 82.37. Additional testing and retesting requirements were imposed on all houses on the same premises as any infected house. Id. § 82.38.

APHIS administered these SE regulations until mid-1995. A total of thirty-eight flocks were restricted between 1990 and 1994, resulting in over 1.3 billion eggs being diverted from the United States table egg market to breaker plants.

### III. Rose Acre Tracebacks

In 1990, after the interim regulations took effect, SE illness outbreaks were traced to each of Cort Acres, White Acres, and Jen Acres. As a result of testing carried out in accordance with the interim regulations, USDA first restricted the interstate transportation of eggs from these three farms on October 5, 1990, November 27, 1990, and January 15, 1991, respectively. In each case, Indiana officials similarly restricted the intrastate transportation of eggs (except for uses requiring pasteurization) shortly after receiving notice of the federal restrictions.

After "test flock" restrictions were imposed as a result of environmental testing at each affected Rose Acre farm, USDA conducted blood and organ testing as set forth in the regulations. For organ testing, USDA employees physically removed sixty hens (whose blood had tested positive) from each house, killed them, and transported their carcasses to a USDA laboratory in Ames, Iowa. As described above, a single positive organ result in a given house resulted in an "infected house" designation. No additional transportation restrictions were imposed as a result of an "infected" designation; obtaining release from restricted status, however, became more difficult. At first, Rose Acre tried to obtain release through continued organ testing of the hens in infected houses. For the most part, however, Rose Acre had to depopulate, clean, and disinfect infected houses, and then have those houses pass USDA inspection. The trial court noted that, in some cases, houses were empty for long periods while awaiting inspection. Rose Acre III, 55 Fed. Cl. at 651. It also noted that USDA inspection officials did no more than visually examine the interior of depopulated houses (after cleaning) with the aid of flashlights. Id.

2007-5169                                        7

Rose Acre finally succeeded in obtaining release from the restrictions imposed on Cort Acres, White Acres, and Jen Acres on July 16, 1992, May 8, 1992, and October 30, 1992, respectively. Thus, for a period of twenty-five months, Rose Acre had to sell eggs as breaker eggs instead of table eggs from one or more of the three farms.

**IV. Rose Acre's Legal Challenges**

Shortly after its operations became subject to the federal and state restrictions, Rose Acre filed an action in the United States District Court for the Southern District of Indiana seeking a declaration that the interim regulations were invalid. In that action, Rose Acre contended that (1) the interim and final regulations deprived Rose Acre of due process, (2) the interim regulations were not promulgated in accordance with the Administrative Procedure Act, (3) both sets of regulations exceeded USDA's statutory authority, (4) the final regulations could not be applied retroactively, (5) both sets of regulations unlawfully delegated authority to state officials, (6) the application of certain monitoring provisions was invalid, and (7) it was entitled to compensation for eggs diverted to breaker plants. Rose Acre Farms, Inc. v. Madigan, No. NA 90-175-C, 1991 U.S. Dist. LEXIS 8691, at *3–4 (S.D. Ind. June 5, 1991). Ultimately, the United States Court of Appeals for the Seventh Circuit held that the regulations were neither arbitrary nor capricious and were promulgated within the authority of the Secretary of Agriculture. Rose Acre I, 956 F.2d at 675–77. It further held that "[i]t is to the claims court that Rose Acre must go" to pursue any claim for compensation. Id. at 674.

Rose Acre filed the present action in the Court of Federal Claims on October 13, 1992, alleging an uncompensated taking of its eggs and hens and violations of

21 U.S.C. §§ 114a[3] and 134a[4] (2000).  The trial court granted the government's motion to dismiss Rose Acre's section 114a claim for failure to state a claim, Rose Acre III, 55 Fed. Cl. at 653, and held, after a two-week trial, that section 134a provides Rose Acre no relief beyond that available under the Fifth Amendment, id. at 662.  The trial court awarded Rose Acre compensation in the amount of $6,165,297.72 for what it concluded was a regulatory taking of eggs diverted to breaker plants and a categorical taking of the hens confiscated for internal-organ testing.  Id. at 665.  The court also awarded Rose Acre $2,414,744.81 in attorney fees and expenses.  Id. at 670.

The government appealed, challenging the trial court's holding that the government actions at issue here constituted a regulatory taking and a categorical taking and the award of fees and expenses (as based on an erroneous judgment that

---

[3]    21 U.S.C. § 114a has since been repealed.  Pub. L. No. 107-171, tit. X, § 10418(a)(8) (May 13, 2002), 116 Stat. 508. It provided, in relevant part:

> The Secretary of Agriculture, either independently or in cooperation with States or political subdivisions thereof, farmers' associations and similar organizations, and individuals, is authorized to control and eradicate any communicable diseases of livestock or poultry . . . which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country, including the payment of claims growing out of destruction of animals (including poultry), and of materials, affected by or exposed to any such disease, in accordance with such regulations as the Secretary may prescribe.

[4]    21 U.S.C. § 134a has since been repealed.  Pub. L. No. 107-171, tit. X, § 10418(a)(17) (May 13, 2002), 116 Stat. 508.  It authorized the seizure, quarantine, and disposal of livestock or poultry to guard against the introduction or dissemination of communicable disease and further provided, in relevant part:

> [T]he Secretary shall compensate the owner of any animal, carcass, product, or article destroyed pursuant to the provisions of this section . . . . Compensation paid any owner under this subsection shall not exceed the difference between any compensation received by such owner from a State or other source and such fair market value of the animal, carcass, product, or article.

takings occurred). In our prior decision, we (1) vacated the trial court's finding with respect to the economic impact prong and instructed the court to reassess this factor; (2) affirmed the trial court's conclusion with respect to Rose Acre's reasonable investment-backed expectations; (3) reversed the trial court's conclusion that the character of the regulatory action favored Rose Acre; and (4) instructed the trial court to reweigh the Penn Central factors to determine whether a compensable taking had occurred. Rose Acre IV, 373 F.3d at 1196.

On remand, the trial court conducted a two-day trial in late 2006, consisting mainly of expert testimony relevant to the Penn Central factors. Rose Acre V, 2007 WL 5177409, at *4. After considering the evidence, the trial court ruled that the severity of the economic impact favored Rose Acre because it suffered a diminution in profit of 219%. Id. at *7. Based on our earlier opinion, the trial court ruled that the character of governmental action favored the government despite Rose Acre's contention that an intervening Supreme Court decision necessitated the reassessment of this factor. Id. at *8. The court had no reason to reanalyze Rose Acre's reasonable investment-backed expectations. Id. In reweighing all three Penn Central factors, the trial court again held that Rose Acre suffered a taking and awarded Rose Acre about $5.4 million as just compensation, plus interest, attorney fees, expert fees, and expenses, for a total of about $8.7 million. Id. at *9, *13. The government timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

**ANALYSIS**

## I. Standard of Review

"Whether a compensable taking has occurred is a question of law based on factual underpinnings." Maritrans Inc. v. United States, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003) (citing Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001)). Our review of a final decision of the Court of Federal Claims after a trial entails a de novo review of legal conclusions and a review of factual findings for clear error. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see also Maritrans, 342 F.3d at 1351.

## II. Fifth Amendment Taking

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. The Takings Clause does not altogether proscribe the taking of property by the government. First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314 (1987). Rather, if the government takes property for a valid "public use," the government must pay the property owner "just compensation," thus barring the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Penn Cent., 438 U.S. at 123 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)).

2007-5169                              11

The common touchstone of regulatory takings precedent is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005). The Supreme Court has noted that, outside the context of "two relatively narrow categories" of per se regulatory takings cases and outside "the special context of land-use exactions," a court conducts a factual inquiry based on the well-known Penn Central factors to evaluate whether the government's regulation rose to the level of a taking. Id. at 538–39; see also Maritrans, 342 F.3d at 1351. The fact-based inquiry of Penn Central considers (1) the economic impact of the action on the claimant, (2) the effects of the governmental action on the reasonable investment-backed expectations of the claimant, and (3) the character of the governmental action. Penn Cent., 438 U.S. at 124. Penn Central governs the facts of this case, and therefore we turn first to the economic impact of the SE regulations.

**A. Economic Impact of the Regulations**

The economic impact of the government's regulatory action is mainly a factual question. Cf. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 720 (1999) ("[W]e hold that the issue whether a landowner has been deprived of all economically viable use of his property is a predominantly factual question."). Therefore, with respect to this factor, we review the findings of the Court of Federal Claims for clear error. Glendale Fed. Bank, 239 F.3d at 1379.

In our prior opinion, we explained that the trial court's initial analysis was insufficient because it only (1) made certain limited factual findings, (2) noted the conclusory testimony of the government's witness, and (3) favorably compared Rose

Acre's claim to the factual situation in <u>Yancey v. United States</u>, 915 F.2d 1534 (Fed. Cir. 1990), where we held that a USDA-imposed quarantine had effected a compensable taking of healthy breeder turkeys. <u>Rose Acre IV</u>, 373 F.3d at 1185. At the same time, we noted several undisputed facts relating to the economic impact of the regulations on Rose Acre. <u>Id.</u> at 1184–85. For example, we recognized that there was agreement with respect to the average price Rose Acre and other sellers received for table eggs during the restricted period and the average price Rose Acre received for breaker eggs during the restricted period. <u>Id.</u>

Thus, there was, and still is, little dispute about the underlying economic data to be used in assessing the economic impact. The main disagreement concerned the methodologies by which to analyze the data. Prior to our remand, the trial court had not sufficiently examined whether the economic impact on Rose Acre should be calculated by a diminution in value analysis or a diminution in return analysis. Then, the government had argued that diminution in return is <u>per</u> <u>se</u> less suitable, but we rejected that contention. <u>Id.</u> at 1188. Rather, we observed that "[w]e need not choose, however, between the two analytical modes." <u>Id.</u> at 1189.

Certain other narrow issues needed further development. One such issue when first appealed was the identity of the correct parcel of property to be used as the "denominator" in the economic impact calculation. At that time, Rose Acre argued that the court should consider only "the revenue derived from the sale of (breaker) eggs from the restricted houses, but determine its profit using its total cost, including the (allocated) fixed costs it incurs in producing eggs in all of the houses on all its farms." <u>Id.</u> (emphasis omitted). The government, on the other hand, argued that "the relevant

denominator is the combined total egg sales from the three farms during the period of restriction, but that profit should be figured using only the marginal cost to Rose Acre of producing each individual egg in the restricted houses." Id. (emphasis omitted). For reasons we need not explicate here, the competing denominators affected the calculation in a way that favored each party. Thus, a proper assessment of costs seemed necessary in order to determine properly the economic impact prong. Moreover, it was necessary to consider as the relevant parcel the three farms as a whole rather than each individual hen house.

In short, we instructed that, "using the three farms (combined) as the relevant 'denominator,' the trial court must determine whether the economic impact in this case is best measured by the value decline (a 10.6% diminution) or profitability decrease (at most, a reduction from a 4.8% profit to a 6.3% loss) caused by the restrictions." Rose Acre IV, 373 F.3d at 1190.

On remand, the trial court heard testimony from the economics experts of both Rose Acre and the government. Rose Acre's expert, Dr. Richard Just, was of the opinion that diminution in value was not an appropriate metric to use in assessing the economic impact and only diminution in return can be used in this case. Rose Acre V, 2007 WL 5177409, at *5. As characterized by the trial court, the government's expert, Dr. Bradley Reiff, purportedly agreed that both methodologies could be used. Id. Since the trial court characterized both experts as accepting a diminution in return approach, the trial court adopted this methodology. Id. at *6. The trial court then proceeded to determine whether the diminution in return should be calculated by using average total cost, as urged by Rose Acre, or incremental costs, as purportedly urged by the

government.  Id. at *6–*7.  After considering the experts' testimony, the trial court concluded that the use of average total cost was more consistent with our prior decision and that the government's "method of determining the diminution in return [i.e., using incremental costs] simply does not reflect reality."  Id. at *7.  The trial court then found that, using average total cost, "the diminution in return for the period of the regulations was 219.2%."  Id.

Except for the cost basis of the eggs, the parties do not generally dispute the underlying financial data.  For instance, during the restricted period, 42.6% of the 135 million dozen eggs produced on the three farms were diverted to and sold in the breaker market.  This means, of course, that 57.4% of the eggs were sold, as usual, in the table market.  With respect to the difference in market value of the diverted eggs, the average decrease in value of each dozen of eggs came to about 6.10 cents.

Yet, the same data appear to provide vastly differing depictions as to the severity of the economic damage incurred by Rose Acre, depending on whether one looks at lost profits or lost values.  It is this divergence between input and output that is at issue here.  Based on our review of the evidence in the record, it is clear that assessing the severity of the economic impact in this case by looking only at the percentage decrease in profits does not provide a sufficiently accurate view.

We believe the diminution in return metric suffers from at least two potential deficiencies which were not addressed by the trial court and which may suggest that such an analysis is not appropriate in all takings situations.  First, the vast majority of takings jurisprudence examines, under Penn Central's economic impact prong, not lost profits but the lost value of the taken property.  See, e.g., Thomas J. Miceli & Kathleen

Segerson, Compensation for Regulatory Takings: An Economic Analysis with Applications 15 (1996) ("Most takings cases since Pennsylvania Coal have generally applied some form of Holmes's diminution of value standard."). When the Supreme Court has assessed the economic impact of a regulatory taking, it has talked almost exclusively in terms of lost value rather than lost profits. See, e.g., Andrus v. Allard, 444 U.S. 51, 65–66 (1979) (approximately 100% diminution in value); Village of Euclid v. Ambler Reality Co., 272 U.S. 365, 384 (1926) (75% diminution in value); Hadacheck v. Sebastian, 239 U.S. 394, 405 (1915) (87.5% diminution in value). Our case law is in accord. See, e.g., Maritrans, 342 F.3d at 1358 (considering 13.1% diminution in value of tanker barges); Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1178 (Fed. Cir. 1994) (noting a 99% diminution in value). Additionally, other federal circuits and the state courts often take a similar approach. See, e.g., Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275, 286 (4th Cir. 1998); Ortega Cabrera v. Municipality of Bayamon, 562 F.2d 91, 100 (1st Cir. 1977); Cent. Motors Corp. v. City of Pepper Pike, 653 N.E.2d 639, 644–45 (Ohio 1995). Thus, when a court considers only a profits-based approach, this precedent provides limited guidance and constrains a factfinder's ability to provide a complete and fair assessment of the economic impact prong of Penn Central.

The trial court's analysis suffers as a result of limited guidance on the profits-based measure, as the court did not compare the 219% diminution in return to anything, such as some benchmark standard. Instead, the court simply viewed the number as indicative of a severe economic impact. This examination is flawed because it does not set any baseline or standard to which to compare an inherently relative number. And,

as Dr. Reiff explained, comparing diminution in return in one case to diminution in value in another case "doesn't mean much." The dearth of comparable diminution-in-return numbers in the case law may have been the root of the trial court's cursory analysis, but comparable numbers seem necessary to assess whether the lost profits represent a severe impact.

A second drawback with examining only the diminution in return parameter is the potential difficulty in comparing any given diminution in return calculation with another diminution in return calculation. Simply put, diminution in return is an inherently relative term, the magnitude of which is dependent on the magnitude of the starting profit margin. As the government's expert, Dr. Reiff, explained, the product of the diminution in return calculation depends on the magnitude of the initial profit margin. Also, unlike diminution in value, which ranges from 0% to 100%, diminution in return can range from 0% to an infinitely large number, depending on the initial profit margin. Dr. Reiff further explained how the diminution in return metric may be difficult to interpret when the initial profit margin is less than zero, i.e., when the company is operating at a loss. The trial court's opinion addressed none of these concerns.

Our concern about sole reliance on diminution in return is illustrated by the following example, which follows directly from and simplifies an example given by Dr. Reiff. Consider a company that manufactures a widget for a total cost of $3. Without any governmental regulation, the widget has a market value of $5, yielding a profit of $2. Under two different regulatory schemes (Regulations A and B), the market value of the widget decreases to differing extents. In the first instance, under Regulation A, the widget sells for $3; in the second, under B, the widget sells for $1.

The resulting calculations for diminution in return (DIR) and diminution in value (DIV) are shown.

| Regulation | Cost | Market Value | Profit | DIR | DIV |
|---|---|---|---|---|---|
| None | 3.00 | 5.00 | 2.00 | *n/a* | *n/a* |
| Regulation A | 3.00 | 3.00 | 0 | 100% | 40% |
| Regulation B | 3.00 | 1.00 | -2.00 | 200% | 80% |

Thus, under Regulation A, the property owner suffers a 100% diminution in return and a 40% diminution in value. Under Regulation B, the property owner incurs a 200% diminution in return and an 80% diminution in value. In absolute dollars, the property owner has lost either $2 or $4 on the sale of each widget, compared to pre-regulation market value. Now, consider the same widget having a much smaller initial profit margin and a smaller decrease in value due to the regulation:

| Regulation | Cost | Market Value | Profit | DIR | DIV |
|---|---|---|---|---|---|
| None | 3.00 | 3.20 | 0.20 | *n/a* | *n/a* |
| Regulation A | 3.00 | 3.00 | 0 | 100% | 6.25% |
| Regulation B | 3.00 | 2.80 | -0.20 | 200% | 12.5% |

In this second case, the economic data yield the same diminution in return but a significantly smaller diminution in value. The smaller diminution in value makes apparent sense, as the property owner is only losing twenty or forty cents on each widget. A last variation of the example illustrates the increased disparity between profit and value calculations when the initial profit margin is even smaller.

| Regulation | Cost | Market Value | Profit | DIR | DIV |
|---|---|---|---|---|---|
| None | 3.00 | 3.02 | 0.02 | *n/a* | *n/a* |
| Regulation A | 3.00 | 3.00 | 0 | 100% | 0.67% |
| Regulation B | 3.00 | 2.98 | -0.02 | 200% | 1.32% |

In each of the above three scenarios, the property owner suffers an arguably severe diminution in return, either earning zero profit or operating at a loss, but incurs vastly different diminutions in value. Under current precedent, we would be hard-pressed to hold that a compensable taking occurred when the diminution in value is less than a penny on the dollar. But if we were to consider only the 100% diminution in return for that same alleged taking, it could seem plausible to conclude differently.

Other variations of the above example yield similarly incongruent results. In the last scenario above, for example, if a regulation decreases the initial value of the widget from $3.02 to $1.81, the widget loses 40% of its value, but that equates to a diminution in profit of about 6,000%. Based on the trial court's analysis and the expert's testimony, we are uncertain how such a value could be used effectively in a takings analysis.

Legitimate questions exist with the diminution in return metric, yet the trial court's opinion does not address them. For instance, as Dr. Reiff explained, when the initial profit margin is negative—meaning that the company is operating at a loss during the relevant regulatory period—calculation of the diminution in profit becomes problematic. And basic mathematical principles impede an analysis when the starting profit margin is zero, as the result of dividing a real number by zero is undefined. Even though the government's expert raised these issues in his expert report and testimony, the trial court's opinion does not address them.

2007-5169                                    19

Instead of acknowledging the testimony of the government's expert with respect to the deficiencies of the diminution in return analysis, the trial court appeared to rely only on a selected piece of his testimony, thus concluding that both experts accepted the diminution in return as the only suitable metric. Rose Acre V, 2007 WL 5177409, at *6. The trial court stated that the government "did not present any evidence on which method best demonstrates the effect of the regulations on plaintiff, but instead asserts that, by any metric, the impact was not severe enough for plaintiff's loss to be considered a taking." Id. at *5. According to the trial court's summary, Dr. Reiff "testified that 'both diminution in revenue and diminution in profit are appropriate measures that the Court could employ in this case.'" Id. at *5 n.14.

Our review of the record, however, reveals a significantly different understanding of Dr. Reiff's testimony. When asked on direct examination whether he had a basis to favor one methodology over another, Dr. Reiff replied as follows:

> These are two measures that the Court should consider. The important point is that if one can't come up with a measure for incremental cost, then the diminution in revenue measure would be superior to the diminution in profit measure. The diminution in profit measure using average total cost is not useful, so if one didn't have incremental cost measure, then I would prefer the diminution in revenue measure. But given that there's—if we can estimate the incremental cost, then you could look at either one of them.

Thus, Dr. Reiff agreed that both metrics could be used but only if the profit calculation used incremental costs, as urged by the government. If average total cost were used— as the trial court did indeed use—then Dr. Reiff's opinion was different. In fact, Dr. Reiff opined that the diminution in profit metric using average total cost "is not useful." The trial court seems to have overlooked this testimony.

Dr. Reiff's expert report, which was admitted into evidence, is consistent with this testimony. In his report, Dr. Reiff opined that "[t]he appropriate measure of the percent diminution in profit should be based only on the incremental cost of the relevant parcel." He also stated in his report that "the diminution in revenue [i.e., diminution in value] is superior to the diminution in profit measure for a number of reasons." The record therefore clearly demonstrates that, although Dr. Reiff agreed that diminution in return could be used, he limited his agreement to using that metric only when incremental costs, and not total costs, were the underlying cost basis.

We understand that, in our prior opinion, we suggested that the diminution in return might be the more appropriate metric. See Rose Acre IV, 373 F.3d at 1188–89. That language was clearly dicta, albeit unfortunate dicta. Our statement, however, stemmed from a framing of the issues less clear than presently before the court. Rose Acre's initial contentions regarding economic harm illustrate how the ambiguous definition of the parcel of allegedly taken property led to some imprecise and unnecessary language in our first opinion. When first filed, Rose Acre's suit sought over $21 million in damages, excluding interest. Rose Acre III, 55 Fed. Cl. at 653. The damages stemmed from alleged wrongs far wider than currently under consideration:

> (1) restricted egg sales; (2) losses from layers taken for necropsy; (3) empty house losses from depopulation through inspection; (4) reduced production during restricted periods before required depopulation; (5) reduced production during unrestricted periods before required depopulation; (6) cleaning and disinfection costs; (7) purchase of table eggs to cover obligations; (8) storage costs for restricted eggs; (9) losses due to disruption of overall business; and (10) interest.

Id. Accordingly, the trial court's approach examined much more than the 135 million dozen egg parcel that is all that is now under examination. For instance, the trial court asserted that "[t]he effectiveness of safe-handling instructions" was a key point in

reviewing the takings claims. Id. at 654. The trial court noted that egg producers such as Rose Acre incurred losses because they "expend additional capital during downtime for cleaning and disinfection." Id. at 658.

We think the proper framing of the issue requires us to refocus on the approximately 135 million dozen eggs produced at the three farms, and not the three farms as a business. Rose Acre itself argues that the relevant parcel of property is the eggs. Rose Acre Br. 37 ("It is the eggs produced on the three farms during the period of restriction, and not the farms themselves, that represent the 'parcel as a whole,' as the Government itself previously maintained."); see also Oral Arg. 30:27–32:00, available at http://oralarguments.cafc.uscourts.gov/mp3/2007-5169 (Rose Acre's counsel agreeing that the relevant parcel is the "135 million dozen eggs that were produced on those three farms during the relevant period"). Furthermore, our remand instructions referred to at most a 6.3% loss. Rose Acre IV, 373 F.3d at 1190. This maximum limit for diminution in return necessarily defined the proper parcel as the eggs and not the business.

Despite our attempted clarification of the issues, much of the expert testimony developed during the remand trial continued to focus on alleged losses not associated with the correct parcel of property.[5] The report of Rose Acre's expert is dominated by discussion of alleged economic costs suffered by Rose Acre as a business rather than

---

[5] The confusion with respect to the parcel is best illustrated by the fact that (1) Rose Acre's expert opined at trial that the parcel is the business, not the eggs; (2) Rose Acre's counsel asserted at oral argument before us that the parcel is the eggs, not the business; (3) the government's expert opined at trial that the parcel is the eggs, not the business; and (4) the government's counsel asserted at oral argument before us that the parcel is the "egg production operation, not the eggs." We accept responsibility for some of this confusion, but that does not relieve us of our duty to apply the law based on the correct parcel of property.

on the diminished value of the eggs. Specifically, in his expert report, Dr. Just considered "[r]educed [egg] production during unrestricted periods as aging flocks awaited USDA decisions about whether depopulation would be required and the extent of cleaning that would be required" and "[d]isinfection costs associated with USDA requirements beyond normal cleaning expense." His testimony during trial also emphasized the importance of looking at the business as a whole. Dr. Just opined that diminution in return was the proper methodology because "it was the destruction of profit that impacted Rose Acre as a business." Rose Acre V, 2007 WL 5177409, at *5. Dr. Just dismissed any usefulness in considering the diminution in value because "[w]hen you look at the impact on an ongoing business concern [like Rose Acre], it just doesn't make sense to look at only the value of an asset." Id. But much of the alleged economic harm to which Dr. Just referred is properly characterized as consequential damages, which are generally not compensable in a takings case. See Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990). At one point, Dr. Just asserted that, if the court considered "all of the losses," Rose Acre "lost 699 percent of profits over 19 months." He equated that number to being "equivalent to losing 100 percent of profits over 11 years. And that is a very substantial effect, and I don't see how most any business can survive that kind of impact." Such testimony clearly referred to economic losses beyond the relevant parcel and was inconsistent with our prior opinion, in which we held that the diminution in profit metric could be "at most, a reduction from a 4.8% profit to a 6.3% loss." Rose Acre IV, 373 F.3d at 1190. The government's expert, Dr. Reiff, criticized this testimony, explaining that Dr. Just's larger damages calculations "really relate to a loss in value to the farms, not a loss to the

relevant parcel itself." We think these criticisms are valid, and the trial court should have considered them.

The importance of properly defining the parcel likely explains why Dr. Just's testimony generally misses the mark with respect to his choice of methodology. As noted above, the eggs produced in the three farms represent the proper parcel. Yet Dr. Just's analysis was stuck on the business as an ongoing enterprise. On direct examination, Dr. Just explained his position as follows:

> Q: Okay. What is—in your opinion, what is the asset whose value that has been diminished under this analysis that we would be trying to understand here?
>
> A: I don't see the case as defined in terms of the value of an asset that was diminished. I think it was the profit from an ongoing business that was diminished.

Later, when called to rebut the testimony of the government's witness, Dr. Just continued with his message that the business as a whole was the parcel.

> Q: Let me move on. Dr. Just, if you were to apply the diminution in value approach, that's the other approach that was referenced by the Federal Circuit, how would you apply that approach to Rose Acre's three farms?
>
> A: Well, I see diminution in value as an approach that is appropriate for valuing an asset. . . . In this case you have a flow of profit, which I think calls for the diminution in profit approach. But if you were to try to use a diminution in value approach in this case, you might look at the value of the three farms the day before the restriction was placed and compare that to the value of those three farms when the restrictions were imposed.

In further explaining his answer, Dr. Just criticized Dr. Reiff's reliance on the value metric: "What Dr. Reiff has done is tried to use the value approach by using the eggs as an asset. The eggs are not the asset in this case, and so that's why the return—or diminution in profit is the appropriate approach to use here." When we review this testimony in light of our holding that the correct parcel is the eggs, it obliterates Dr.

Just's opinion that the diminution in return is the proper metric. Once the parcel is defined as the eggs—and we see no reason why the eggs are not an asset of the company—Dr. Just's statement that diminution in value is "an approach that is appropriate for valuing an asset" is further confirmation that we ought to rely on the value metric rather than the return metric.[6]

Dr. Just also testified that he was amazed how a company could keep going based on a diminution in profit of 219%. But that number by itself is actually misleading as to the economic effect on Rose Acre as an ongoing business concern. The 219% number reflects the lost profit of only three out of Rose Acre's total of nine farms. We disagreed with the trial court's Rose Acre III opinion because it did not "explicitly rest its conclusion that the impact was severe on any appraisal of the effect of the restrictions relative to Rose Acre's relevant unaffected property interests." Rose Acre IV, 373 F.3d at 1188. It seems that this analysis is again absent. Simply concluding that a 219% decrease in profits is severe is not particularly enlightening unless that number is put in the context of the business operation as a whole. The 219% decrease in profits tells us nothing about Rose Acre's profitability as a whole during the restricted period. If we could conclude anything, it is perhaps through Rose Acre's own expert who confirms that Rose Acre was able to absorb the cost of complying with the regulations by relying on the profits generated from the other six farms. If the proper parcel were the business as an ongoing enterprise, then we would have to understand how the 219% diminution in return compared to the profits Rose Acre earned from the six unaffected farms.

---

[6] Certain assets may be analyzed in terms of a stream of future revenue deriving from the assets, in which case diminution in return might be a useful metric, but the eggs here are not amenable to such an analysis.

Rose Acre also places much reliance on the intervening decision in Cienega Gardens v. United States, 503 F.3d 1266 (Fed. Cir. 2007), cert. dismissed, 129 S. Ct. 17 (2008), but its reliance is misplaced due to the substantial factual differences between Cienega Gardens and the present dispute. Cienega Gardens involved a complex regulatory scheme intended to encourage investment in low-cost rental housing. Id. at 1270–74. The asserted property right was not in a tangible asset or even a piece of land but rather the contractual right to prepay certain mortgages without subjecting the property owner to new financial limitations on permissible rental rates. Id. at 1274. Overreliance on factually dissimilar situations, such as the one in Cienega Gardens, muddies a regulatory takings analysis because, as the Supreme Court has repeatedly cautioned, such an analysis inherently "is characterized by an 'essentially ad hoc, factual inquir[y]' designed to allow 'careful examination and weighing of all the relevant circumstances.'" Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002) (quoting Penn Cent., 438 U.S. at 124, and Palazzolo v. Rhode Island, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).

The factual differences between Cienega Gardens and the present case also lead us to the issue of the SE regulations' duration. We noted in our previous opinion that "the court should also consider the significance of the fact that the regulations restricted Rose Acre's operations temporarily—for a period of about two years." Rose Acre IV, 373 F.3d at 1195. The trial court acknowledged that the regulatory time period was "relatively brief," but it nonetheless concluded that the impact was severe. Rose Acre V, 2007 WL 5177409, at *7. Rose Acre's expert, Dr. Just, explained that, although the regulation was in effect for only twenty-five months, the lost value was

equivalent to three-and-a-half years worth of profit.  Id.  Hearing Dr. Just's testimony that a "219.2% loss of profits is 'equivalent to losing 100 percent of profits over 3 ½ years,'" the trial court concluded that the economic impact was severe and weighed heavily in favor of Rose Acre, despite the short regulatory duration.  Id.

Defining the parcel of property as the eggs, however, clarifies the weight properly afforded the duration of the regulation.  When the property allegedly taken is a discrete asset, such as a food commodity, the duration of the regulation becomes less important in the overall analysis.  The totality of the economic loss, for purposes of a takings analysis, is generally captured by the diminution in value metric, when the "taken" property is food or another commodity.  The timing of the regulation is generally more important in cases where, for various reasons, it is more difficult to calculate the financial devaluation.  See, e.g., Tahoe-Sierra, 535 U.S. at 307–12 (addressing a taking claim due to a delay in permitting); First English Evangelical, 482 U.S. at 307–10 (temporary restriction on right to rebuild on land in a flood zone); Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351–52 (Fed. Cir. 2004) (delay in issuing a permit for mining); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1367–69 (Fed. Cir. 2004) (permitting case).  For these reasons, the duration of the temporary restrictions does not strongly favor Rose Acre's claim.

Because the parcel of property is now clearly defined as the diverted eggs themselves, we are convinced that it was clear error to place sole reliance on the diminution in return metric.  The eggs are a discrete asset, the market value of which is readily ascertainable.  Indeed, as mentioned above, the parties do not materially dispute the average market value of the eggs in the table market versus the breaker during the

regulated period. These data provide a clear picture of the decrease in value of the eggs.[7]

Instead, when we consider all three offered metrics of economic impact, with the primary weight given to the diminution in value, we conclude the trial court clearly erred in determining that Rose Acre suffered a severe economic impact due to the SE regulations. Rose Acre points to no case in which a court has found a diminution in value of 10% as being severe or as favoring a taking. Additionally, the infirmities in the diminution in return metric, as discussed above, warrant against placing much, if any, weight on that calculation on the facts of this case. We hold therefore that, although the monetary loss to Rose Acre was not insignificant, it did not even approach the level of severe economic harm and thus does not strongly favor Rose Acre.

Finally, the government requests that we consider the off-setting economic benefits of the regulation, which, according to the government, the trial court ignored. In doing so, the government urges that "common sense" dictates some consideration of the beneficial effects which the SE regulations had on Rose Acre's business and the egg industry as a whole. Under certain circumstances, regulatory action may confer an

---

[7] This is not to say that, in other circumstances, a factfinder may never rely solely on diminution in return to assess the economic impact of the regulation. In this case, however, we need not decide whether the trial court should have looked only at diminution in value without consideration of diminution in return. Thus, we do not hold that it is never proper to consider diminution in return as one proper metric in assessing a takings claim even when the property subject to regulatory action is a discrete asset, such as some commodity. Certain circumstances not presented to us here may support a more balanced examination of multiple economic indicators. Other mathematical formulations or certain normalization algorithms could perhaps render moot our concerns stated above about the diminution in profit metric. Conversely, upon a more searching analysis of the analytical methods, a court might conclude that diminution in return is never appropriate when analyzing certain classes of non-categorical takings claims. None of this need we decide today. Therefore, we leave those issues for future cases.

economic benefit on a party subject to the regulation.  See Cienega Gardens, 503 F.3d

at 1283 ("The Supreme Court in Penn Central clearly held that offsetting benefits must

be accounted for as part of the takings analysis itself." (citation omitted)).  Here, the

government points to no economic data in the record to support its assertion of off-

setting benefits.

## B. Reasonable Investment-Backed Expectations

In Rose Acre IV, we affirmed the trial court's ruling with respect to Rose Acre's

reasonable investment-backed expectations.  We summarized the trial court's analysis

as follows:

> The trial court noted that, although the poultry industry in general is
> highly regulated, government experts previously believed that salmonella
> could contaminate the interior of a shell egg only via a crack or break in
> the shell.  [Rose Acre III, 55 Fed. Cl.] at 659 (citing a government expert's
> testimony regarding the 1970s-era belief held by the Food and Drug
> Administration and the CDC that shell eggs were not associated with
> foodborne diseases).  Accordingly, prior to 1990, eggs were subject only
> to inspection and restriction for evidence of potential environmental
> contamination.

Rose Acre IV, 373 F.3d at 1191.

Disagreeing with the government's view, we concluded that "the SE regulations

were more than an extension of comparable regulations to a new disease.  They were

grounded in new scientific understanding (i.e., that salmonella could be transmitted from

hen to egg) and were unprecedented in their reliance on environmental and hen

testing."  Id.  Thus, we held that, "even accounting for the history of regulation in the

poultry and egg industries, we cannot agree that the trial court erred in concluding that

this factor favors Rose Acre."  Id.  On remand, the trial court had no reason to

reevaluate this factor; it thus remains in Rose Acre's favor.

**C. Character of the Government's Action**

In Rose Acre III, the trial court found that the character of the government's regulations favored Rose Acre. The trial court "conclude[d] the SE regulations were misguided because they relied on ineffective testing methods." Rose Acre III, 55 Fed. Cl. at 660. The court also concluded that Rose Acre "shared a disproportionate amount of the burden of the SE regulations." Id.

In our prior decision, we reversed the trial court's conclusion with respect to the character of the government's action. Rose Acre IV, 373 F.3d at 1195. We held this conclusion to be erroneous because, in part, the trial court's "misgivings about the regulations are primarily based on its finding that a less-burdensome, alternative regulatory scheme—egg testing—was feasible." Id. at 1193. We explained, however, that "the issue is not whether a less restrictive alternative to the government action existed or was 'possible.' It is whether there is a nexus between the regulation and its underlying public purpose." Id. at 1194 (emphasis in original) (citing Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987)). We faulted Rose Acre because it neither argued nor showed "that the regulatory means were inconsistent with knowledge the government possessed at the time they were adopted or applied against Rose Acre." Id. at 1195.

Between the time we remanded the case and the time the trial court rendered its decision, the Supreme Court changed the takings landscape with its decision in Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005). In a unanimous retreat, the Supreme Court discarded the "substantially advances" test set forth in Agins v. City of Tiburon, 447 U.S. 255 (1980). Lingle, 544 U.S. at 540. In doing so, the Court marked a clear

distinction between substantive due process analysis and Fifth Amendment takings analysis. <u>Id.</u> Although the Court had admittedly discussed and approved the "substantially advances" language over the intervening twenty-five years, the Court concluded that it had never held a compensable taking based on the <u>Agins</u> test. <u>Id.</u> at 546. The Court thus reaffirmed the outcome in cases such as <u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>, 480 U.S. 470 (1987), in which the "substantially advances" test was arguably applied. The holdings of such cases, read in light of the particular facts of each case, it ruled, remain viable precedent. <u>See Lingle</u>, 544 U.S. at 546.

The government argues that <u>Lingle</u> in no way changes the analysis under <u>Penn Central</u>. We cannot agree. The opinion's language itself signals the change in the law. <u>E.g.</u>, <u>Lingle</u>, 544 U.S. at 544 ("[T]he 'substantially advances' formula is not only <u>doctrinally</u> untenable as a takings test—its application as such would also present serious practical difficulties." (emphasis in original)). To the extent that other circuits have had the chance to visit the issue, those courts recognize that <u>Lingle</u> alters the calculus. <u>See Spoklie v. Montana</u>, 411 F.3d 1051, 1058 (9th Cir. 2005) ("[T]he Supreme Court has just disavowed the use of the 'substantially advances' test in takings claims . . . ."); <u>see also Adams v. Village of Wesley Chapel</u>, 259 Fed. Appx. 545, 549–50 (4th Cir. 2007) (unpublished). In addition to its effect on the takings analysis itself, the Ninth Circuit has noted that "<u>Lingle</u> pulls the rug out from under our rationale for totally precluding substantive due process claims based on arbitrary or unreasonable conduct." <u>Crown Point Dev., Inc. v. City of Sun Valley</u>, 506 F.3d 851, 855 (9th Cir. 2007); <u>see also A Helping Hand, LLC v. Baltimore County</u>, 515 F.3d 356, 369 n.6 (4th Cir. 2008) (observing that <u>Lingle</u> "explicitly distinguished between takings and

substantive due process claims" and thus substantive due process claims based on property restrictions are not supplanted by takings law).

State courts which have addressed Lingle have come to a similar conclusion. See Vanek v. State Bd. of Fisheries, 193 P.3d 283, 293 (Alaska 2008) (noting Lingle's demarcation between takings and due process analyses); Kafka v. Dept. of Fish, Wildlife & Parks, 2008 MT 460, 2008 WL 5413504, at *19–*20 (Mont. 2008) (noting the Supreme Court's "rejection of the 'substantially advances' formula"); Scofield v. Dep't of Natural Res., 753 N.W.2d 345, 358–59 (Neb. 2008) (appreciating Lingle's clarification of takings law); El Paso Prod. Co. v. Blanchard, 269 S.W.2d 362, 370 (Ark. 2007) (setting aside any consideration of the "substantially advances" test); Biddle v. BAA Indianapolis, LLC, 860 N.E.2d 570, 577 n.17 (Ind. 2007) ("To the extent our prior decisions have relied on the Agins formulation, they are overruled."); Mansoldo v. State, 898 A.2d 1018, 1024 (N.J. 2006) (declaring that, in view of Lingle, "considerations of 'legitimate state interest[s]' have no bearing on whether the [state] regulation effected a taking"); Gove v. Zoning Bd. of Appeals, 831 N.E.2d 865, 870 (Mass. 2005); Wild Rice River Estates, Inc. v. City of Fargo, 705 N.W.2d 850, 854 (N.D. 2005) (noting the disavowal of the Agins test by Lingle); Coast Range Conifers, LLC v. State Bd. of Forestry, 117 P.3d 990, 998–99 (Or. 2005); Byrd v. City of Hartsville, 620 S.E.2d 76, 80 (S.C. 2005) ("To the extent that some of our previous cases have applied Agins alone or both Agins and Penn Central, we overrule them.").

Commentators have likewise expressed their opinion that Lingle alters the takings landscape. See, e.g., Robert G. Dreher, Lingle's Legacy: Untangling Substantive Due Process From Takings Doctrine, 30 Harv. Envtl. L. Rev. 371, 402

(2006) ("[Lingle] rejects any normative component to takings law based on considerations of the efficacy or wisdom of the government's actions."); D. Benjamin Barros, At Last, Some Clarity: The Potential Long-Term Impact of Lingle v. Chevron and the Separation of Takings and Substantive Due Process, 69 Alb. L. Rev. 343, 349 (2005) ("[I]t is undeniable that by eliminating the substantially advance standard the Court took at least a modest step in clarifying its regulatory takings doctrine."); John D. Echeverria, Making Sense of Penn Central, 23 UCLA J. Envtl. L. & Pol'y 171, 200 (2005) ("Lingle, of course, jettisons the substantially advances test as a free-standing test.").

Thus, we can confidently say that, under Lingle, the regulatory takings paradigm has changed. We can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill. All those concerns, albeit relevant concerns in many cases dealing with governmental regulations, are now confined to a substantive due process inquiry. See Equity Lifestyle Props., Inc. v. County of San Luis Obispo, 548 F.3d 1184, 1194 n.17 (9th Cir. 2008) ("Due process violations cannot be remedied under the Takings Clause . . . ." (citing Lingle, 544 U.S. at 543)). And, as we have noted previously, the Seventh Circuit has long ago adjudicated those due process claims of this case. See Rose Acre I, 956 F.2d at 672–74.

Because Lingle indeed altered the analytical framework, the trial court should have reassessed the character prong of Penn Central. See Wopsock v. Natchees, 454 F.3d 1327, 1333 (Fed. Cir. 2006) ("It is well established . . . that law-of-the-case principles do not bar a court from departing from earlier rulings when there is 'an

intervening change of controlling legal authority' . . . ." (quoting Toro Co. v. White Consol. Indus., 383 F.3d 1326, 1336 (Fed. Cir. 2006))). In our prior opinion, we clearly applied the Agins test when we were dealing with "the distinct issue of consideration of 'whether the regulation[s] appropriately advance[d] a substantial government interest.'" Rose Acre IV, 373 F.3d at 1195 n.15 (quoting Tahoe–Sierra, 535 U.S. at 323). That inquiry is now obsolete. Although the trial court was, in part, correct that "Lingle does not necessarily invalidate" the character determination from Rose Acre IV, the trial court also thought its character-prong analysis from Rose Acre III "was likely the correct approach under Lingle." Rose Acre V, 2007 WL 5177409, at *8. Given the significant change in the law effected by Lingle and because we still disagree with aspects of the approach set forth in Rose Acre III, we feel it necessary to explain our reasoning in further detail.

Turning to what Lingle requires us to do rather than what we cannot do, the Supreme Court instructed that, instead of looking at the rationality of the regulation, we must consider "the actual burden imposed on property rights, or how that burden is allocated." 544 U.S. at 543. The Court likewise directed that "the magnitude or character of the burden a particular regulation imposes upon private property rights" is an important consideration, as the now-discarded "substantially advances" test reveals nothing about that burden. Id. at 542 (emphasis in original). The Court also criticized a means-end analysis because it does not "provide any information about how any regulatory burden is distributed among property owners." Id. (emphasis in original).

Applying these insights to our present case, the undisputed facts indicate that the SE regulations did not single out Rose Acre. Instead, the enacted rules broadly applied

to almost any egg producer in the United States. Specifically, the rules affected "primary and multiplier breeding flocks used for the purpose of producing progeny for commercial egg production, and to egg production flocks used for the purpose of producing table eggs for sale or other distribution in interstate commerce." 55 Fed. Reg. at 5578. The regulations admittedly did not apply to all poultry flocks because USDA focused its efforts "on controlling the spread of SE in the segments of the poultry industry where the spread of SE is most prevalent, i.e., egg-type flocks." Id. Additionally, the rules affected only those farms, whether Rose Acre's or another company's, which tested positive for SE. Id. The SE regulations as enacted targeted no single egg producer unless SE-infected eggs were traced back to a particular farm and that farm tested positive. Only then did an egg producer experience the negative consequences of the SE regulations.

In Rose Acre's view, however, the SE regulations could, and perhaps should, have been drafted more broadly. Specifically, because the regulations did not cover food handlers and the egg-consuming public, according to Rose Acre, the regulations' burdens were distributed "narrowly, and devastatingly, upon a few egg producers like Rose Acre." Additionally, the company argues, Rose Acre, more so than any other egg producer, disproportionately suffered the consequences of the regulation because Rose Acre's eggs could be traced back to its farms more easily than the eggs of most other egg producers. These contentions seem to approach or possibly step over the line drawn in the sand by Lingle because, in some respect, they challenge the effectiveness of the regulations, which Lingle says we cannot do in a takings analysis. Moreover,

even if Rose Acre's contentions are proper considerations under <u>Lingle</u>, we do not think they are sufficiently persuasive.

Based on this assessment then, even under <u>Lingle</u>'s new approach, the character of the SE regulations in this case do not favor Rose Acre. But, before deciding this factor, we need to consider the related issue of the public health and safety aspect of the SE regulations. In our view, although <u>Lingle</u> alters one aspect of analyzing regulatory takings, it leaves unchanged a substantial body of case law concerning the character prong. The asserted taking in <u>Lingle</u> had nothing to do with the safety or health of the public. Rather, <u>Lingle</u> addressed a law intended to modify the distribution of wealth by "imposing certain restrictions on the ownership and leasing of service stations by oil companies." 544 U.S. at 533. The state of Hawaii enacted the law "in response to concerns about the effects of market concentration on retail gasoline prices." <u>Id.</u> We think it is clear that <u>Lingle</u> neither addressed nor disturbed <u>Penn Central</u>'s consideration of the health and safety aspect of the regulations. <u>See</u> <u>Penn Cent.</u>, 438 U.S. at 125. To put <u>Penn Central</u>, <u>Lingle</u>, and the present case in the proper context, it will be helpful to summarize briefly the history and underlying bases of food regulation by governments in a takings analysis.

For almost as long as food has been in commerce, some "regulation" of food has existed. Cato, Pliny the Elder, and Galen all described recommendations or warnings about the quality of prepared foods. <u>See</u> George M. Burditt, <u>The History of Food Law</u>, 50 Food & Drug L.J. 197, 197 (1995). <u>See generally</u> Peter Barton Hutt & Peter Barton Hutt II, <u>A History of Government Regulation of Adulteration and Misbranding of Food</u>, 39 Food Drug Cosmetic L.J. 2 (1984). After the Dark Ages, England's Parliament in

1266 codified food laws which "prohibited the sale of any 'corrupted wine' or any meat, fish, bread, or water that was 'not wholesome for Man's body' or that was kept so long 'that it loseth its natural wholesomeness.'" Peter Barton Hutt, Government Regulation of the Integrity of the Food Supply, 4 Annual Rev. of Nutrition 1 (1984), reprinted in Peter Barton Hutt, Richard A. Merrill, & Lewis A. Grossman, Food and Drug Law 1–2 (3d ed. 2007).

In the United States, common law generally governed early limitations on the right to sell certain foods. Violations of those limitations incurred both civil and criminal liability. "To be sure, it was a crime at common law knowingly to sell bad food . . . ." Lawrence M. Friedman, A History of American Law 461 (2d ed. 1985). Early courts in the United States imposing civil liability on a person for selling tainted food did not necessarily base their rulings on legal theories common today. In Van Bracklin v. Fonda, 12 Johns. Cas. 468, 468 (N.Y. Sup. Ct. 1815), the court affirmed a jury verdict for the plaintiff who, along with others, had eaten beef that was "bad and unwholesome." The ruling in Van Bracklin sounded in contract more than tort or nuisance law, but nonetheless confirms that the right to sell food has long been subject to certain strictures. As the law developed, courts accepted findings of liability based on then-novel doctrines. "In the late 1800s, courts in many states began imposing negligence and strict warranty liability on commercial sellers of defective goods." Restatement (Third) of Torts: Products Liability § 1 cmt. a (1998). In some cases, food manufacturers were held liable for unwholesome food under a theory of negligence. E.g., Jackson Coca-Cola Bottling Co. v. Chapman, 64 So. 791, 791 (Miss. 1914) (affirming a finding of liability when the plaintiff became ill after drinking from a cola

bottle in which a "'wee, sleekit, cow'rin,' tim'rous beastie' [had] drowned" (quoting Robert Burns, To A Mouse)). In other instances, manufacturers of food were liable to a consumer under a theory of implied warranty of merchantability, for example, even though the manufacturer and consumer were not in privity of contract because the consumer had purchased the food from a retailer. E.g., Ward v. Moorhead City Sea Food Co., 87 S.E. 958, 958 (N.C. 1916) ("The authorities are numerous that there is an implied warranty, that runs with the sale of food for human consumption, that it is fit for food and is not dangerous and deleterious."). Later courts perceived little difference between the two theories. See Davis v. Van Camp Packing Co., 176 N.W. 382, 392 (Iowa 1920) (allowing plaintiff to rely on either negligence or implied warranty of wholesomeness against manufacturer of beans). As commerce developed, states turned to statutory law to define the rights of property owners with respect to food products.

Although the courts effectively resolved individual disputes between private parties involving unfit food, systemic deficiencies in the nation's food supply persisted. In the latter half of the nineteenth century, some states tackled the problem by increasingly enacting legislation which broadly regulated aspects of the growing food trade. During the same period, Congress considered numerous pieces of legislation that would authorize federal regulation of the food industry. Eventually, in 1906, Congress enacted the Meat Inspection Act[8] and the Pure Food and Drugs Act, the latter

---

[8] Earlier that same year, Upton Sinclair published his novel The Jungle (1906), which tells the dark story of Jurgis Rudkis, a young Lithuanian immigrant working in Chicago's meatpacking plants. Sinclair's description of both the working conditions and the meat processing itself inflamed the public's concern about the Chicago stockyards and food safety in general. At one point in the novel, Sinclair

of which paved the way for the creation of the FDA and the more comprehensive Federal Food, Drug, and Cosmetic Act of 1938. Since that time, the public has come to expect that federal agencies will police the safety of the food products in interstate commerce.

There is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong of a <u>Penn Central</u> analysis. <u>See Appolo Fuels</u>, 381 F.3d at 1351 (considering "government action designed to protect health and safety" within the character prong of <u>Penn Central</u>). Even long prior to <u>Penn Central</u>, the Supreme Court considered health and safety in takings cases. <u>See, e.g.</u>, <u>Miller v. Schoene</u>, 276 U.S. 272, 280 (1928) (upholding a law requiring the destruction of cedar trees to prevent the spreading of cedar rust that imperiled nearby apple orchards); <u>Mugler v. Kansas</u>, 123 U.S. 623, 668 (1887) (rejecting a takings challenge to laws prohibiting the production or sale of intoxicating beverages). In the present case, we of course need not, and thus do not, conclude that the federal government has an absolute right to condemn or seize food, without any possible liability, merely because, as here, the government declares the food to be potentially dangerous or unhealthy.

Turning to the government's current position, at times the government appears to argue for a <u>per se</u> exception to a regulatory taking based on the regulation's public health purpose. In its opening brief, the government writes that "Rose Acre has no

---

explained how men working in the slaughterhouses would sometimes fall into a vat of lard, and "they would be overlooked for days, till all but the bones of them had gone out to the world as Durham's Pure Leaf Lard!" <u>Id.</u> at 117. Whether that particular anecdote was true mattered not, as Sinclair's work spurred both President Theodore Roosevelt and Congress to take action on pending legislation. <u>See, e.g.</u>, <u>Meat Inspection Bill Passes The Senate</u>, N.Y. Times, May 26, 1906, at 1 (reporting how the Senate's passage of the bill was "the direct consequence of the disclosures made in Upton Sinclair's novel, 'The Jungle'").

private property right dictating that the Government pay it to stop using its property in a manner that threatens public health." Yet, it never goes so far as to assert a blanket exception to the Penn Central analysis here. And, during oral argument, government's counsel was less than resolute in arguing that the law requires a per se exception to the Penn Central. But the government did argue that the character of the government's act, protecting the public health by identifying diseased eggs and forcing their owner to remove them from the table market, weighs strongly against finding a taking here. We agree.

Rose Acre, on the other hand, reads Lingle's characterization of Penn Central as a demotion of the character prong to a secondary and optional factor. Citing the Supreme Court's description of Penn Central, Rose Acre contends that we can only consider the public health aspect of the SE regulations in a diminished and optional role. See Rose Acre Br. 57 (arguing that "the Supreme Court deemphasized Penn Central's character prong, holding it 'may' also be considered if relevant to the regulatory-takings analysis"). Putting aside the question of whether Lingle properly characterizes Penn Central, and disregarding that the quoted sentence is in no way a holding of Lingle, we do not believe Lingle caused any diminution in the importance of the Penn Central character prong, at least with respect to public health and safety regulations.

When we view what the law sets forth with respect to the selling of food for human consumption, we must recognize that—whether through criminal law, nuisance law, or tort law—the law has long imposed significant restrictions on the food-property owner. In the present case, "the severity of the burden that government impose[d] upon

private property rights," Lingle, 544 U.S. at 539, was not impermissible because the SE regulations restricted uses of personal property in which the restrictions were directed at the protection of public health and safety. That is the type of regulation in which the private interest has traditionally been most confined and governments are given the greatest leeway to act without the need to compensate those affected by their actions. See Jacob Ruppert, Inc. v. Caffey, 251 U.S. 264, 303 (1920) (prohibition on sale of "near beer" in order to make prohibition of alcoholic beverages more effective was a regulation "for the preservation of the public health" and not a taking); Purity Extract & Tonic Co. v. Lynch, 226 U.S. 192, 201 (1912) (noting the right of states to prohibit the sale of intoxicating liquors); N. Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306, 315 (1908) (recognizing a state's authority to seize unwholesome food "based upon the right and duty of the state to protect and guard, as far as possible, the lives and health of its inhabitants"). This assessment leads us to conclude that a regulation ending the production and sale of such eggs in the table market, although allowing their sale in the breaker market, cannot be described as imposing an undue burden on the egg producer. Furthermore, we need not determine that the proscribed activity constitutes a public nuisance in order to conclude that the character prong favors the government. See Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1369 (Fed. Cir. 2004) (rejecting appellants' position that, "because oil and gas exploration is not a public nuisance, the Court of Federal Claims improperly considered the concerns for public welfare in its Penn Central analysis"). Finally, for similar reasons, we cannot conclude that the SE regulations are "functionally equivalent to the classic taking in which

government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539.

In the end, the effect of Lingle in this case is for the character of the government's regulations to more strongly favor the government than when we examined the issue in Rose Acre IV.

### D. Balancing of the Penn Central Factors

The purpose of the takings clause is to ensure fairness, to both the property owner and the public. See Armstrong v. United States, 364 U.S. 40, 49 (1960). When balancing the factors adduced through the Penn Central analysis, our objective is to ascertain whether, in light of those factors, it is unfair to force the property owner to bear the cost of the regulatory action. In doing so, we can look to the outcomes in other cases, recognizing however that reference to isolated facts in other takings cases provides limited guidance. As frequently reminded, a regulatory takings analysis is generally an "ad hoc" analysis. Penn Cent., 438 U.S. at 124.

Litigants and commentators often put too much emphasis on any one of the Penn Central factors, based on the favorable outcome of prior cases. Reminding a court, as Rose Acre does, that a taking was found in Yancey when there was a diminution in value of only 77% is practically useless without further context. It is not that prior cases have no precedential value. Rather, the holding of each case must be carefully scrutinized and understood, within the context of the particular facts, in order to apply that holding faithfully in future cases. In other words, there is no magic number or formula in takings cases.

Furthermore, <u>Yancey</u> is quite distinguishable on its facts from the present case. In <u>Yancey</u>, the USDA imposed an emergency quarantine on poultry in an effort to contain an outbreak of pathogenic Avian Influenza, a highly contagious viral disease but generally of little risk to humans. 915 F.2d at 1536. The plaintiffs suffered a diminution of 77% in the value of their turkey breeder flock. <u>Id.</u> at 1539. Thus, unlike the present case, <u>Yancey</u> resolved a takings claim relating to governmental action causing a substantial decrease in property value in the absence of any significant threat of illness to the public. For at least this reason, <u>Yancey</u> yields little support for Rose Acre's position.

When we review all the factual findings above, we conclude that they require a holding of no compensable taking. First, Rose Acre's economic impact is not severe. Second, although the reasonable investment-backed expectations favor Rose Acre, they are not strong enough to be dispositive. Third, the character of the government's regulations strongly favors a non-taking.

For comparison purposes, we note that the present case is quite similar as a whole to <u>Maritrans</u>. In <u>Maritrans</u>, we held that no compensable taking occurred when, in response to the 1989 <u>Exxon Valdez</u> oil spill, Congress enacted legislation requiring single-hulled oil tankers to be either retrofitted with double hulls or phased out of service. 342 F.3d at 1348–49. The single-hulled oil tankers owned by the plaintiff in <u>Maritrans</u> suffered a 13.1% diminution in value. <u>Id.</u> at 1358. That diminution in value is quite similar to the approximately 10% loss in value of the diverted eggs from Rose Acre's three affected farms, which were 43% of all the eggs produced there. We also noted in <u>Maritrans</u> that

> [t]he character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition, by obligating the court to "inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented."

Id. at 1356 (quoting Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994)).[9] We considered the law's public safety aspect, viz., "protecting the waterways of the United States from oil spills for environmental and navigational reasons." Id. at 1357. We also recognized that a finding in favor of the property owner "would have the effect of creating a disincentive for the government to enact publicly beneficial laws by requiring compensation every time a statute or regulation affects a property owner's interests." Id. In doing so, we concluded that the character of the governmental action weighed against the property owner. Id. at 1358. Thus, given the small diminution in value and the importance of the public safety aspect of the legislation, we affirmed the trial court's decision of no taking. That precedent, then, strongly supports our holding here, for the cases are analogous.

Although Rose Acre may feel otherwise, the law of regulatory takings does not generally compensate property owners when a regulation's economic impact is slight and temporary but the potential for physical harm to the public is significant. Here, infected eggs could have caused serious illness and possibly even death.

## CONCLUSION

For the foregoing reasons, we hold that Rose Acre did not suffer a compensable taking when, due to the SE regulations, approximately 43% of its table eggs were

---

[9] While the language referring to "the ease with which any harm" could be prevented arguably invokes the Agins test, the other text refers to the question of whether the regulated activity constitutes a nuisance, as the quoted section from Creppel was applying the nuisance analysis in Lucas. See Creppel, 41 F.3d at 631.

diverted to the breaker egg market, and where the eggs had an approximately 10% lower market value. Although Rose Acre's reasonable investment-backed expectations suggested a taking may have occurred, the economic impact of the regulations was not severe and the character of the government's actions strongly favored the United States. Returning to the touchstone of regulatory takings law, we conclude that, as analyzed under Penn Central, the SE regulations were not functionally comparable to government appropriation or invasion of private property and that the regulations properly placed the burden on Rose Acre to bear the costs associated with ensuring that their eggs did not injure the public. Accordingly, we hold that the United States is not liable to Rose Acre for just compensation.

REVERSED

COSTS

No costs.