DYK, Circuit Judge,
concurring in the judgment and dissenting-in-part.
I agree with the majority’s decision to reverse the Claims Court judgment finding a regulatory taking and with the majority’s affirmance of the Claims Court’s dismissal of the contract claim. I write separately because I disagree with the majority’s reasoning in significant respects. In particular, I disagree with the majority’s incorrect and wholly unnecessary dictum approving aspects of the Claims Court’s takings analysis. In my view, the majority’s decision refusing to consider offsetting benefits is directly contrary to our precedent, and its treatment of the character of the government action fails to recognize that the government’s action is a form of rent control that the Supreme Court and other circuits have found to be legitimate.
I The Economic Impact Analysis
This case again presents the question whether the rent-control restrictions of ELIHPA and LIHPRHA constituted a regulatory taking. In Cienega Gardens v. United States (“Cienega X”), 503 F.3d 1266, 1282-87 (Fed.Cir.2007), we held that an analysis of the economic impact prong of the takings analysis required a consideration of offsetting benefits during the period that the restrictions of ELIHPA and LIHPRHA were in place, namely consideration of the right to sell the property for *1251 fair market value and, failing such a sale, the right to exit the program and to be free of the rent control and other restrictions. The necessity of considering such benefits was not merely a suggestion. It was a direct holding expressed repeatedly in the language of the opinion. We held in Ciénega X that the “error committed by the [Claims Court] lies in its failure to consider the offsetting benefits that the statutory scheme afforded which where specifically designed to ameliorate the impact of the prepayment restrictions.” Id. at 1282-83. “The [offsetting] benefits must be considered as part of the takings analysis” itself, not merely as part of a just compensation calculation. Id. at 1283-84.
The Claims Court here, in direct contradiction of our holding in Ciénega X, refused to consider offsetting benefits in the economic impact analysis, finding those benefits to be “speculative.” CCA Assocs. v. United States, 91 Fed.Cl. 580, 618 (2010). While reversing the decision of the Claims Court, the majority, without justification, approves the Claims Court’s refusal to follow Ciénega X.
The Claims Court’s justification for refusing to consider offsetting benefits rests on two subordinate and incorrect propositions — first, that the burden of proof on offsetting benefits rested with the government, and second, that the government could not bear its burden of proof unless it established that CCA, the owner of the property, could actually have sold the property during the period of the restrictions. I consider each of these in turn.
A The Burden of Proof
As I discuss in greater detail below, the design of LIHPRHA was to impose a form of rent control on the developers of low-income housing that received federal financial assistance.[1] The impact of LIHPRHA was to keep this rent control in place for an additional five years subject to the ability of the owners to sell their property for fair market value or to prepay the mortgage and exit the program. The claim is that the developers here lost money because they were forced to charge below-market rents for this five-year period.
The economic impact analysis is, of course, part of the three-part Penn Central test for regulatory takings. See Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The object of the economic impact analysis is to determine the economic impact of the regulatory scheme as a whole on the affected parties. In order to determine the economic impact, the overall nature of the scheme must be evaluated, including any exceptions to the regulation. For example, if a zoning regulation or permitting scheme provides variances or exceptions, the economic impact of those must be taken into account. See id. at 137, 98 S.Ct. 2646. Thus we held in Cienega X, 503 F.3d at 1282-87, that simply treating LIHPRHA as extending rent control for five years was not accurate. This was because the developer had other options to escape the rent-control regulation, options that we characterized as “offsetting benefits,” that is, exceptions to the regulatory obligations. Id. The owner could escape the rent controls by selling the property for fair market value or prepaying the mortgage and exiting the program. If an owner wished *1252 to prepay and exit the program, the owner was required to first offer the property for sale to purchasers who would pay fair market value to the seller and maintain the property as low-income housing for its remaining useful life. An appraisal process, involving two appraisers (one selected by the Department of Housing and Urban Development (“HUD”) and the other by the owner), determined “the fair market value of the housing based on the highest and best use of the property.” 12 U.S.C. § 4103(b)(2). Then, HUD would provide financial incentives to the purchasers to assist them in purchasing the property. Id. §§ 4110(d), 4111(d). If HUD failed to provide financial assistance or a willing buyer could not be found, owners could prepay their mortgages and exit the program. Id. §§ 4113(c)(l)-(3), 4114(a). While this process unfolded, the prepayment restriction preserved the status quo and kept the HUD rent control restrictions in place.[2]
The Supreme Court has repeatedly held that the burden of proof for takings claims lies with the plaintiff. In Eastern Enterprises v. Apfel, the Court stated that “a party challenging governmental action as an unconstitutional taking bears a substantial burden.” 524 U.S. 498, 523, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). The Court also held in Keystone Bituminous Coal Ass’n v. DeBenedictis that there was no taking because the plaintiffs had not satisfied their “heavy” “burden of proving that they [had] been denied [an] economically viable use of [their] property.” 480 U.S. 470, 493, 499, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).
Under the Supreme Court’s decision in Penn Central, the economic impact analysis is a critical element of the takings analysis. 438 U.S. at 124, 98 S.Ct. 2646. The burden of proof on economic impact, as with other elements of the Penn Central test, rests with the claimant, as this court has confirmed in Ciénega X and other cases. As we said in Cienega X, for each of the Penn Central factors, “the burden is on the owners.” 503 F.3d at 1288. See also Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed.Cir.1999). Both the Claims Court and the majority agree that the burden of proof on economic impact rests with the plaintiff. Majority Op. at 8 (“The plaintiff must establish economic impact....”); CCA Assocs., 91 Fed.Cl. at 613 (“CCA undoubtedly ha[d] the burden of proof on each of the Penn Central factors, including that of economic impact.”).
The error of the Claims Court and the majority is in viewing offsetting benefits as not part of the economic impact analysis.[3] In Ciénega X, we directly held that offsetting benefits are part of the economic impact analysis, not a separate analysis relating to the calculation of just compensation. 503 F.3d at 1283-84. Simply put, the “offsetting benefits must be accounted for as *1253 part of the takings analysis.” Id. at 1283 (citing Penn Central, 438 U.S. at 137, 98 S.Ct. 2646). In Ciénega X, moreover, we held that the question of economic impact had to be determined taking account of the regulatory scheme as a whole. Id. at 1282-83. We specifically held that the Claims Court had erred “in its failure to consider the offsetting benefits that the statutory scheme afforded which were specifically designed to ameliorate the impact of the prepayment restrictions.” Id. at 1282-83; see also id. at 1283 (distinguishing the statutory framework based on its “amelioration of the restrictions imposed on the existing property”). In assessing economic impact, it was not permissible to treat the statute as though it simply imposed rent control for a five-year period; it was necessary to consider the economic impact of the fact that opportunities existed to eliminate the rent control restrictions. Id. at 1283-85.
The Supreme Court has similarly held that the complete nature of a challenged statute must be considered in an economic impact analysis. For example, in Penn Central, the offsetting benefits “undoubtedly mitigate[d] whatever financial burdens the law [had] imposed on appellants and, for that reason, are to be taken into account in considering the impact of the regulation.” 438 U.S. at 137, 98 S.Ct. 2646. In Connolly v. Pension Benefit Guaranty Corp., the Court held that the Multiemployer Pension Plan Amendments Act of 1980 (“MPPAA”), requiring employers to pay into a pension fund, was not on its face a taking because of the lack of serious economic impact. 475 U.S. 211, 225-26, 228, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). “[A]s to the severity of the economic impact of the MPPAA, there [was] no doubt that the Act completely deprive^] an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability.” Id. at 225, 106 S.Ct. 1018. But there, as here, “there [were] a significant number of provisions in the Act that moderate[d] and mitigate[d] the economic impact of an individual employer’s liability.” Id. at 225-26, 106 S.Ct. 1018. Such offsets included “sections of the Act [that] moderate[d] the impact ... by exempting certain transactions” and other “sections [that] reduce[d] the size of the financial liability in various instances.” Id. at 226 n. 8, 106 S.Ct. 1018. These moderating and ameliorating features were required to be taken into account in the economic impact analysis.
Similarly, in Forest Properties, 177 F.3d at 1367, we placed the burden of proving the entire economic impact, including costs saved, on the plaintiff. Forest Properties involved a tract of land, a portion of which could not be developed as planned due to the denial of a permit. Id. at 1366. The plaintiff provided evidence of what the post-development value of the restricted land would be, but did not account for the development costs that the plaintiff would incur to develop the land. Id. at 1367. The evidence “reflected] the development of the lots following the denial of the permit,” but “[did] not necessarily reflect [the] [fair market] value immediately after the permit was denied.” Id. Accordingly, we held that “Forest had the burden of proof to establish a regulatory taking, and it failed to carry that burden.” Id.
Furthermore, this is not a situation where the necessary information regarding offsets was in possession of the government but not the plaintiffs. The plaintiffs were well aware of the scope of the regulatory scheme. Even if this were a situation where the relevant information was in possession of the government but not the plaintiffs, that would suggest merely shifting the burden of production, as we have done in recent government contract cases with respect to avoided costs, while main *1254 taining the ultimate burden of proof on the plaintiffs. We held in those contract cases that “a non-breaching plaintiff bears the burden of persuasion to establish both the costs that it incurred and the costs that it avoided as a result of a breach of contract.” Boston Edison Co. v. United States, 658 F.3d 1361, 1369 (Fed.Cir.2011). In such contexts, “the breaching party may be responsible for affirmatively pointing out costs that were avoided,” but ultimately “the plaintiff must incorporate them into a plausible model of [] damages.” Id. (citing S. Nuclear Operating Co. v. United States, 637 F.3d 1297, 1304 (Fed.Cir.2011); Energy Nw. v. United States, 641 F.3d 1300, 1307-08 & n. 5 (Fed.Cir.2011)).
In light of the Supreme Court’s and our own precedents, there is simply no basis for shifting the burden of proof from the plaintiffs to the government for offsetting benefits or for separating those benefits from the overall impact of the statutory scheme. The majority’s sole basis for holding otherwise is a snippet of language in Rose Acre Farms, Inc. v. United States, 559 F.3d 1260 (Fed.Cir.2009), in which the government argued a plaintiff egg producer “benefitted from operating in an environment [created by the regulation] that protected the public from the spread of salmonella” because, without government action, “the public’s confidence in th[e] market would have deteriorated, reducing demand” for eggs. Brief of DefendantAppellant at 47-48, Rose Acre, 559 F.3d 1260 (No. 2007-5169). We rejected this claim, noting that the government had “point[ed] to no economic data in the record to support its assertion.” Rose Acre, 559 F.3d at 1275. However, Rose Acre involved indirect benefits flowing from the solution to the regulatory problem, rather than specific benefits provided to those affected by government regulation which were “designed to ameliorate the impact of [the regulation].” Cienega X, 503 F.3d at 1283. It provides no support for the Claims Court’s impermissible shifting of the burden of proof concerning the direct impact, or lack of impact, of the regulation itself.
B The Failure to Consider Offsetting Benefits as Part of the Economic Impact Analysis
I also disagree with the majority’s approval of the Claims Court’s decision in another aspect of the economic impact analysis: its characterization of the offsetting benefits as “speculative.” See CCA Assocs., 91 Fed.Cl. at 618. While I agree with the majority that an 18% economic impact (not considering offsetting benefits) is not sufficient to establish a taking, the majority is entirely off base in suggesting that the impact here was in the 18% range. This analysis entirely ignores offsetting benefits. In Ciénega X, we held that these offsetting benefits must be taken into account, id. at 1283-84, and even in this case, the record establishes that the economic impact was far less than the 18% figure assumed by the majority. This is so regardless of whether the burden of proof on economic impact rested with the plaintiffs or the government.
The parties here agreed that the economic impact would be measured based on the diminution in value of CCA’s property due to the rent control (i.e., the difference between what a buyer would have paid in May 1991 for Chateau Cleary unencumbered by HUD restrictions and what a buyer would have paid in May 1991 encumbered by the HUD restrictions). The parties stipulated that the economic impact without considering offsetting benefits was 18%. CCA introduced no evidence as to the impact of offsetting benefits, i.e., the ability to sell the property or to otherwise escape future *1255 rent control. Only the government supplemented the record to provide further evidence of the economic impact of offsetting benefits. The government submitted expert testimony that the potential to sell the property for fair market value, or to exit the program and raise rents to market rates, necessarily would affect the value of the property. The government’s expert report adjusted the stipulated value calculation to account for offsetting benefits, concluding that continuing the restrictions reduced the value of the property by only 5%.
However, the Claims Court held that offsetting benefits could only be taken into account if there was “reasonable certainty” that a sale would have occurred, and that such a reasonable certainty did not exist.[4] CCA Assocs., 91 Fed.Cl. at 618. The possibility that CCA could exit the program was therefore “speculative.” Id. The finding underlying this conclusion is based on a misunderstanding of the relevant statutes and, insofar as it represents a finding of fact, is clearly erroneous.[5] But more importantly, the Claims Court’s approach reflects a fundamental misunderstanding of the valuation process, one that CCA continues to urge on appeal. CCA argued that its “position throughout has been that the value of these statutory ‘options’ cannot be quantified because, inter alia, CCA never availed itself of any options, and therefore to quantify the ‘value’ of the options would be an exercise in speculation.” Plaintiff-Cross Appellant’s Br. 51. The question is not whether CCA would have availed itself of the offsetting benefits or whether a sale would have occurred. The proper analysis is whether a prospective purchaser in May 1991 would have attributed value to the opportunities offered by the statutory scheme to exit the program and escape the rent control obligations. Determining market value involves consideration of “[a]ll facts which the owner would properly and naturally press upon the attention of a buyer with whom he is negotiating a sale, as well as those facts which would naturally influence a person of ordinary prudence desiring to purchase the property.” 4 Nichols on Eminent Domain § 12.02 (2010). *1256 “[C]ourt[s] must consider any aspect of the property that could have affected the amount a reasonable buyer would be willing to pay.” A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 585 (11th Cir.2001).
As discussed above, cases such as Penn Central and Connolly require that ameliorating sections in the statutory scheme be taken into account in the economic impact analysis. The Supreme Court has also recognized that a valuation analysis must take into account other possibilities that could affect market value even when they are not certain to occur. In Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973), the government condemned a lessee’s property interest (including improvements the lessee had made to the land), and the Ninth Circuit held that it was not necessary to take into account the possibility that the lease might have been renewed because that would be “speculative].” The Supreme Court rejected this argument, holding that “[b]y failing to ... tak[e] into account the possibility that the lease might be renewed as well as the possibility that it might not [the lower court] failed to recognize what a willing buyer would have paid for the improvements.” Id. at 474, 93 S.Ct. 791. The Court explained that failing to account for this possibility “is not how the market would have valued [the] improvements” because a buyer would not have assumed that “there [was] no possibility of’ a lease renewal. Id. at 478, 93 S.Ct. 791.
Similarly, in Great Northern Nekoosa Corp. v. United States, 711 F.2d 473 (1st Cir.1983), the First Circuit reiterated this principle in the context of a valuation for tax purposes. The court held that the federal government’s designation of a piece of plaintiffs property as a “possible part” of a national wildlife system had to be considered in determining the property’s market value even though the parcel would only become part of the system if the state agreed. Id. at 475. Though such an event was “uncertain,” the possibility “substantially reduced its market value because it would necessarily affect the price which would be paid by a willing seller.” Id.[6] A leading appraisal guide also confirms that the “right to sell an interest” in one’s property is an “individual right” in the property that “has some potential value.” Appraisal Institute, The Appraisal of Real Estate 112 (13th ed. 2008).
In keeping with this standard approach, the government’s appraisal expert, Dr. Dickey, testified that the possibility of a sale, or the possibility of prepayment if a sale did not occur, “provided potential avenues to realize at least some value in the property” and that “accounting for these options would lower the measure of economic impact.” Transcript of Record at 1631, CCA Assocs. v. United States, 75 Fed.Cl. 170 (2007) (No. 98-CV-334) (“Transcript”). In fact, CCA itself filed a notice of intent under ELIHPA to preserve these very options.
These opportunities were, moreover, hardly remote possibilities. Sales of rent controlled properties occurred nationwide under LIHPRHA, including four in the New Orleans area where CCA’s property was located, and the government’s expert testified that he was unaware of any instance where an owner could not find a *1257 willing purchaser. Hundreds of such transactions nationwide were completed. The government’s expert also testified that the process could be commenced a year before the prepayment date and was usually completed in eighteen to twenty-four months. See 12 U.S.C. § 4101 (2000). The Claims Court here acknowledged that it was “possible” that CCA could have “found a buyer and obtained the necessary approval from HUD to complete a sale” before HOPE lifted the prepayment restrictions. CCA Assocs., 91 Fed. Cl. at 618.
Even in the unlikely event that a buyer could not be found, LIHPRHA allowed owners to exit the program if they could not consummate a sale because they did not find a willing purchaser or did not receive HUD funding for the sale. 12 U.S.C. § 4114(a)(l)-(2). Owners who exited the program were allowed to raise their rents to market rates unless their project was located in a “low vacancy area” (defined by HUD as a less than 3% vacancy rate), in which case owners could not raise rates on existing tenants for three years. 12 U.S.C. § 4113(c)(1) — (3). Even if the three-year grace period applied here (a matter in dispute), it applied only to tenants who occupied their apartments when the owner filed his notice of intent. 12 U.S.C. § 4113(c)(1). Owners could raise the rents on other units.
Under standard valuation theory, it is particularly inappropriate to focus (as the Claims Court did here) on whether CCA itself could have sold its property for market value. “To establish market value, it is not necessary to point out any designated person able and willing to buy the property at the price alleged (or at any price), or to show that the owner is in fact willing, or even has the legal capacity, to sell it.” 4 Nichols on Eminent Domain § 12.02.' “[T]he application of this concept [of market value] involves, at best, a guess by informed persons.” United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Appraisals are “based on market comparisons” to comparable properties. Appraisal Institute, supra, at 297, 301-02, 377. Therefore, the fact that numerous other comparable owners in the same program took advantage of the statute’s opportunities and consummated sales is clearly relevant and indicates that the benefits had value. Significantly, the Claims Court made no finding that the possibility of a sale or other option was without value.
The government’s expert report showed that the possibility of a sale of the property would have resulted in only a 5% diminution in value from the LIHPRHA rent control. The report assumed that a sale could have occurred by November 1992 and the fair market sale would have effectively allowed CCA to realize market-rate income for the period following November 1992.
Whether or not the 5% figure represented the definitive measure of the economic impact in this case, the evidence, at a minimum, indicates that the value of the benefits was substantial. The economic impact was far less severe than the 18% figure.
II The Character of the Government Action
Finally, I dissent from one other aspect of the majority’s decision — its approval of the Claims Court’s prior analysis as to the character of the government action, which it held to be “analogous to a physical invasion” rather than a mere form of transitional rent control. CCA Assocs., 75 Fed. Cl. at 190. Although in Cienega Gardens v. United States (“Cienega VIII”), 331 F.3d 1319 (Fed.Cir.2003), a panel of this court determined the government action had the character of a taking because it *1258 was akin to a physical invasion, id. at 1338, the panel also recognized that a different result was possible based on different arguments and a different record, id. at 1355. Here, in contrast to Ciénega VIII, the government urged that LIHPRHA imposed a form of rent control, and therefore, a form of permissible government action. Specifically, the government argued that the “Preservation Statutes merely limited the owner’s ability to unilaterally raise tenant rents,” and “[r]ent control statutes are not generally considered to have the character of a taking.” Defendant-Appellant’s Br. at 38-39.
In its post-trial brief to the Claims Court, the government similarly urged that “the character of the Preservation Statutes [was] akin to standard rent control statutes” because “the statutes merely limited the owner’s ability to raise rents.” Defendant’s Post-Trial Memorandum of Contentions of Fact and Law at 47, CCA Assocs., 91 Fed.Cl. 580 (No. 97-CV-334). CCA also viewed the preservation statutes as primarily imposing rent control, urging that the preservation statutes effected a taking by limiting CCA’s ability to charge market rents.[7] CCA argued that LIH-PRHA curtailed its “ability to prepay the mortgage ... and thereby to operate Chateau Cleary as a market-rate property.” Plaintiff’s Post-Trial Memorandum of Contentions of Fact and Law at 18, CCA Assocs., 91 Fed.Cl. 580 (No. 97-CV-334). At trial, CCA’s managing partner testified that the regulatory agreement allowed HUD to “control the rents,” which would have been higher if CCA had been permitted to prepay in May 1991, allowing for greater income and cash flow. J.A. 2. He complained that CCA could have charged “at least 20, 25 percent higher” rents. J.A. 4. Similarly, in its brief to this court, CCA stressed that it had to charge “HUD-approved” rents and that it “lost the right to rent units at market rates.” Plaintiff-Cross Appellant’s Br. at 4, 20. Commentators have agreed that LIHPRHA imposed “a type of rent regulation.”[8]
The Congressional justification for the continuing rent control after the prepayment date was clear enough. As the first prepayment dates grew near during the 1980s, Congress grew concerned that project owners would eliminate rent control by exiting the program, severely depleting the supply of affordable housing units. Congress feared the loss of over 330,000 units due to mortgage prepayments and the elimination of rent control. Congress stressed that absent government action, tenants whose landlords prepaid their mortgages would be forced either to “stay in [the] project and pay substantial rent increases or begin a search for housing in markets where comparable affordable housing does not exist.” S.Rep. No. 101-316, at 103 (1990), 1990 U.S.C.C.A.N. 5763, 5872. Congress feared “that elderly and low income tenants [would] have no alternative but to be thrown in the street without further action” by the government to continue rent control. H. Rep. No. 100-122, at 48 (1987) (Conf. Rep.), reprinted in *1259 1987 U.S.C.C.A.N. 3317, 3370. The statute “protected low-income tenants from evictions or sharp increases in rent.” S.Rep. No. 101-316, at 98, 1990 U.S.C.C.A.N. 5763, 5867.
The “substantial public purpose” of a statute weighs against the finding of a taking. Penn Central, 438 U.S. at 127, 98 S.Ct. 2646. As this court said in Rose Acre, 559 F.3d at 1281, “[tjhere is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong.” There is no doubt that rent control has a significant harm-preventing purpose. In Block v. Hirsh, 256 U.S. 135, 154, 156, 41 S.Ct. 458, 65 L.Ed. 865 (1921), the Supreme Court recognized that “Mousing is a necessary of life,” and that rent-control statutes are designed to prevent conditions “dangerous to the public health.”
Rent control and rent stabilization laws have been almost invariably held to represent legitimate government acts and not to support either physical or regulatory takings challenges. See, e.g., Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); Block, 256 U.S. 135, 41 S.Ct. 458; Guggenheim v. City of Goleta, 638 F.3d 1111 (9th Cir.2010) (en banc); Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal, 83 F.3d 45 (2d Cir.1996); Kavanau v. Santa Monica Rent Control Bd., 16 Cal.4th 761, 66 Cal.Rptr.2d 672, 941 P.2d 851 (1997); Rent Stabilization Ass’n v. Higgins, 83 N.Y.2d 156, 608 N.Y.S.2d 930, 630 N.E.2d 626 (1993). The Supreme Court in Yee recognized the legitimacy of rent control and expressed concern with such regulations only if the statute “compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.” 503 U.S. at 528, 112 S.Ct. 1522. However, this is not such a case. LIH-PRHA only restricted the landlord’s rights for approximately five years, and owners had opportunities to exit the program through sale or prepayment before that.[9]
CCA does not contest that rent control statutes have a vital public purpose, and that it retained the ability to select tenants within the eligible group of low and moderate income individuals, to evict tenants for cause, and even to leave the units vacant. But, CCA contends that the LIHPRHA rent control scheme is distinguishable from the type of rent control approved in other cases because it (1) restricted CCA’s ability to evict tenants and prevented CCA from choosing tenants who did not fit HUD’s income requirements, (2) prevented CCA from converting the property to another use, and (3) prevented CCA from selling the property without HUD approval. Rent control schemes that impose restrictions, including some or all of these features, have frequently been upheld.
First, many rent control regimes restrict a landlord’s ability to evict tenants or to select tenants but have been held not to result in takings. See, e.g., Yee, 503 U.S. at 524-27, 112 S.Ct. 1522 (upholding a local rent-control ordinance that prevented owners of mobile home parks from evicting their tenants and from selecting their tenants); Block, 256 U.S. at 154, 41 S.Ct. 458 (upholding a District of Columbia rent control statute that, inter alia, allowed a tenant to remain in possession after expira *1260 tion of his lease as long as he continued to pay the rent fixed by a government commission); Troy Ltd. v. Renna, 727 F.2d 287, 290-91, 301-02 (3rd Cir.1984) (sustaining a New Jersey statute that prevented landlords who converted an apartment building to a condominium from evicting senior citizens and disabled tenants for forty years unless, inter alia, the tenants’ income level was above a certain threshold).
Second, courts have upheld against takings challenges regulatory schemes that put severe restrictions on a property owner’s ability to convert rent regulated properties to new uses, such as condominiums. In fact, the District of Columbia Circuit has recognized that “takings clause challenges in th[e] context [of restrictions on conversion of rental property] have not fared well.” Silverman v. Barry, 727 F.2d 1121, 1126 (D.C.Cir.1984); see Fresh Pond Shopping Ctr., Inc. v. Callahan, 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983) (statute preventing removal of a rent controlled property from the rental housing market absent a permit from the rent control board); Gilbert v. City of Cambridge, 932 F.2d 51, 54, 56-57 (1st Cir.1991) (upholding ordinance which “prohibit[ed] an owner from ‘removing’ any [housing units offered for rent before August 1979] from the rental market without first obtaining a permit from the Rent Control Board”); Nash v. City of Santa Monica, 37 Cal.3d 97, 207 Cal.Rptr. 285, 688 P.2d 894, 896, 898 (1984) (upholding a rent control law that “prohibit[ed] removal of rental units from the housing market by conversion or demolition absent a removal permit”); see also Sadowsky v. City of New York, 732 F.2d 312, 318-19 (2d Cir.1984) (rejecting regulatory takings claim against ordinance restricting conversion).
Third, the fact that CCA could sell its property only to purchasers who promised to maintain the rent restrictions is a feature of many rent-control provisions and has not been held to create a taking. See Fresh Pond, 464 U.S. 875, 104 S.Ct. 218 (statute requiring any purchasers of the rent controlled property to abide by the rent control restrictions); Silverman v. Barry, 845 F.2d 1072, 1077 (D.C.Cir.1988) (upholding conversion law requiring that owners offer to sell their rent-controlled properties to tenant cooperatives before other prospective purchasers).
Far from imposing unusual restrictions, the LIHPRHA scheme, as discussed above, was less intrusive than other rent control regimes by allowing owners to sell their property and to exit the program.
LIHPRHA did not place the burdens solely on the owners. Rather, there was a substantial sharing of the burden between the program owners and the general taxpayers at large, a feature that cuts against takings. See Penn Central, 438 U.S. at 148, 98 S.Ct. 2646 (describing the design of the Takings Clause “to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (internal quotation marks omitted)). From the outset, the section 221(d)(3) program involved a transfer of substantial benefits from taxpayers as a whole to the projects owners. Government subsidies provided the owners with below-market interest rates, and the government also insured the owners’ nonre-course loans and provided substantial tax breaks. Under LIHPRHA, HUD expended federal funds to entice non-profit organizations or other buyers to purchase owners’ properties at fair market value and to provide incentives for owners to enter into use agreements. Congress authorized HUD to spend $638 million on these incentives during the 1993 fiscal year alone. 12 U.S.C. § 4124(a). Through the end of *1261 2006, the federal government spent about $1.2 billion to preserve 751 projects containing about 19,000 units, constituting an outlay of approximately $19,000 per unit. Maggie McCarty, Congressional Research Service Report: Preservation of HUD-Assisted Housing 23 (2010), available at http://www.preserveoregonhousing.org/ CRS_Pres_Report.pdf. In fact, Congress wanted to end LIHPRHA’s prepayment restrictions because it viewed the program as too “costly” and the benefits as providing a “windfall” for project owners. S.Rep. No. 104-140, at 37 (1995).
For these reasons, I conclude that the character of the government action does not support CCA’s takings claim.[10]

. The majority analyzes both ELIHPA and LIHPRHA. See Majority Op. at 1246. However, only the provisions of LIHPRHA impacted the plaintiffs. Congress enacted ELIHPA on February 5, 1988. ELIHPA was then superseded by LIHPRHA, which was enacted on November 28, 1990, before CCA's predecessor became eligible to prepay its mortgage on May 17, 1991.

. In addition to permitting the owner to escape the regulation, the statute also offered incentives (so-called use agreements) if an owner agreed to maintain the property as low-income housing subject to rent control for its remaining useful life. Congress viewed this as a "fair and reasonable exchange” because the rates of return provided for under these use agreements "compare[d] well to rates of return expected ... in market rate housing,” taking into account the low risk of the government program. S.Rep. No. 101— 316, at 105 (1990), 1990 U.S.C.C.A.N. 5763 at 5874.

. See Majority Op. at 1245 ("Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case.”); CCA Assocs., 91 Fed.Cl. at 613-14 ("Once CCA [had] established the economic impact of the restriction in question, the burden [was] on the government to show that other statutory benefits should offset that impact.”).

. Similarly, the Claims Court held that "to adopt [the government expert’s] estimate [of a 5% economic impact], this court must find that it was probable that CCA could have pursued a sale and have successfully sold the property under ELIHPA if it had sought to do so.” CCA Assocs., 91 Fed.Cl. at 614.

. The Claims Court concluded that it was uncertain whether a sale would have occurred because there was no notice of a sale option under ELIHPA, no reasonable certainty that CCA could have found a willing buyer, and a sale under LIHPRHA would have taken so much time that HUD funding would have no longer been available. The first of these findings is legally erroneous. As noted above, the ELIHPA statute and regulations specifically mentioned the possibility of a sale, and CCA itself filed a notice of intent under ELIH-PA which mentioned that it might pursue a sale of the property. The second and third findings are immaterial. If a buyer could not be found or funding was not available, CCA could have exited the program. 12 U.S.C. § 4114(a). Moreover, the second and third findings are clearly erroneous. The owner of four separate properties in the New Orleans area found a buyer for his properties. Indeed, the government’s expert testified that he was unaware of any owners who were unable to find willing purchasers. And in November 1990, CCA itself was approached (through an executive of the company servicing CCA’s mortgage) by a non-profit buyer that was potentially interested in purchasing Chateau Cleary. The evidence established that the LIHPRHA sale process could be completed in two and a half years or less, meaning that a LIHPRHA sale begun in April 1992 could have been completed before 1995 when HUD began to encounter problems funding sales. And the funding problems might not have been fatal to a sale even after 1995, as four properties in the New Orleans area were still sold after the funding problems arose.

. See also State Highway Comm'n v. Stockhoff, 16 Or.App. 647, 519 P.2d 1281, 1284 (1974) (noting that the possibility Oregon might exercise its contractual option to build a road over plaintiff's right of way that would decrease the value of plaintiff’s property would affect market value because "a prospective buyer would likely be influenced by the existence of the option in determining the purchase price”).

. See Plaintiff's Pre-Trial Memorandum of Contentions of Fact and Law at 1, CCA As-socs., 75 Fed.Cl. 170 (No. 97-CV-334) (arguing that "[t]he government effected a regulatory taking of CCA's right to exist HUD's low-income housing program and to convert its property to conventional market rate rentals”).

. Robert Meltz, et al., The Takings Issue: Constitutional Limits on Land Use Control and Environmental Regulation 300 (1999); see also Daniel L. Siegel, et al., Temporary Takings: Settled Principles and Unresolved Questions, 11 Vt. J. Envtl. L. 479, 501 n.176 (2010) (describing preservation statutes as "provisions which restricted the ability of [project owners] from ... avoiding rent control requirements”).

. In rejecting the Cienega plaintiffs’ physical takings claims, we recognized that Yee was "controlling” because "the effect of the prepayment restrictions ... [was] merely to enhance an existing tenant’s possessory interest” rather than authorize a permanent occupation. Cienega Gardens v. United States (‘‘Cienega VI”), 265 F.3d 1237, 1248 (Fed.Cir.2001) (quoting Cienega Gardens v. United States, 33 Fed.Cl. 196, 217 (1995)).

. I also note my disagreement with the majority opinion to the extent that it seeks to cast doubt on our decision in Cienega Gardens v. United States ("Ciénega IV”), 194 F.3d 1231 (Fed.Cir.1998), rejecting a similar contract claim.